Clerk's Office
Filed Date:          Received via Pro Se Email
                     3/10/21 at 4:10 p.m.- KC

3/10/2021
4:10 PM

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
Arlene Joyce Furfero,

                           Plaintiff,                    **AMENDED COMPLAINT**

          -against-                          20-CV-2395 (BMC) (LB)


St. John's University, Conrado "Bobby"
Gempesaw, Simon Møller, Norean Sharpe,
Charles Clark, Joseph Oliva, Joshua Hurwit,
Nada Llewellyn, Keaton Wong, Michelle
Cadle, and Danielle Haynes,

                         Defendants,
-------------------------------------------------------X

I.      **The Parties to This Complaint**

A.      **The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | Arlene Joyce Furfero |
| Street Address | 1373 Weaver Street |
| City and County | Scarsdale, Westchester |
| State and Zip Code | New York 10583 |
| Telephone Number | 914-725-3657 |
| E-mail Address | drfurfero@drfurfero.com |

B.      **The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title (if known).  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | St. John's University |
| Job or Title | Employer |
| Street Address | 8000 Utopia Parkway |
| City and County | Jamaica, Queens |
| State and Zip Code | New York 11439 |
| Telephone Number | 718-990-2000 |
| E-mail Address | |

Defendant No. 2

| | |
|---|---|
| Name | Conrado "Bobby" Gempesaw |
| Job or Title | President |
| Street Address | 8000 Utopia Parkway – Newman Hall 3rd fl |
| City and County | Jamaica, Queens |
| State and Zip Code | New York 11439 |
| Telephone Number | 718-990-6755 |
| E-mail Address | pres@stjohns.edu |

See attached for I.B. Defendants (cont'd).

C.     **Place of Employment**

The address at which I sought employment or was employed by the defendant(s) is:

|  |  |
|---|---|
| Name | St. John's University |
| Street Address | 8000 Utopia Parkway |
| City and County | Jamaica, Queens |
| State and Zip Code | New York 11439 |
| Telephone Number | 718-990-2000 |

## II.     **Basis for Jurisdiction**

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

X     Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note:  In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

X     Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note:  In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

☐     Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

*(Note:  In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐     Other federal law *(specify the federal law)*:

_____

X     Relevant state law *(specify, if known)*: NYS Executive Law § 296

X     Relevant city or county law *(specify, if known)*: Title 8 of the Administrative Code of the City of New York

3

III.   **Statement of Claim**

Write a short and plain statement of the claim.  Do not make legal arguments.  State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought.  State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

A.   The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

☐   Failure to hire me.

☐   Termination of my employment.

☐   Failure to promote me.

☐   Failure to accommodate my disability.

X   Unequal terms and conditions of my employment.

X   Retaliation.

X   Other acts *(specify)*:   Denied summer session courses and compensation; unwarranted disciplinary charges and suspension

*(Note:  Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)*

B.   It is my best recollection that the alleged discriminatory acts occurred on date(s)

Various dates. See attached for III.E. Statement of the Facts in my Case

C.   I believe that defendant(s) *(check one)*:

X   is/are still committing these acts against me.

☐   is/are not still committing these acts against me.

D.   Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

☐   race _____

☐   color_____

X      gender/sex _____

☐      religion _____

☐      national origin _____

X      age.  My year of birth is 1946.  *(Give your year of birth only if you are asserting a claim of age discrimination.)*

☐      disability or perceived disability *(specify disability)*

        _____

E.     The facts of my case are as follows.  Attach additional pages if needed.

See attached for III.E. Statement of the Facts in my Case.

*(Note:  As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

## IV.    Exhaustion of Federal Administrative Remedies

A.     It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*

September 12, 2019.

B.     The Equal Employment Opportunity Commission *(check one)*:

☐      has not issued a Notice of Right to Sue letter.

X      issued a Notice of Right to Sue letter, which I received on *(date)* March 4, 2020.

*(Note:  Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

C.     Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

X      60 days or more have elapsed.

☐      less than 60 days have elapsed.

**V.      Relief**

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

See attached for V. Relief.

**VI.     Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

**A.      For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: March 10, 2021.

Signature of Plaintiff      _s/_____

Printed Name of Plaintiff    Arlene Joyce Furfero

I.B. Defendants (cont'd)

Defendant No. 3

| | |
|---|---|
| Name | Simon Møller |
| Job or Title | Provost |
| Street Address | 8000 Utopia Parkway – Newman Hall Room 240 |
| City and County | Jamaica, Queens |
| State and Zip Code | New York 11439 |
| Telephone Number | 718-990-6308 |
| E-mail Address | mollers@stjohns.edu |

Defendant No. 4

| | |
|---|---|
| Name | Norean Sharpe |
| Job or Title | Dean, Tobin College of Business |
| Street Address | 8000 Utopia Parkway – Bent Hall Room 311 |
| City and County | Jamaica, Queens |
| State and Zip Code | New York 11439 |
| Telephone Number | 718-990-6476 |
| E-mail Address | sharpen@stjohns.edu |

Defendant No. 5

| | |
|---|---|
| Name | Charles Clark |
| Job or Title | Chair, Economics and Finance Department |
| Street Address | 8000 Utopia Parkway – Bent Hall Room 330 |
| City and County | Jamaica, Queens |
| State and Zip Code | New York 11439 |
| Telephone Number | 718-990-7343 |
| E-mail Address | clarkc@stjohns.edu |

Defendant No. 6

| | |
|---|---|
| Name | Joseph Oliva |
| Job or Title | VP for Admin, Secretary, and General Counsel |
| Street Address | 8000 Utopia Parkway – Newman Hall Room 218 |
| City and County | Jamaica, Queens |
| State and Zip Code | New York 11439 |
| Telephone Number | 718-990-6421 |
| E-mail Address | olivaj@stjohns.edu |

Defendant No. 7

| | |
|---|---|
| Name | Joshua Hurwit |
| Job or Title | Associate General Counsel |
| Street Address | 8000 Utopia Parkway – Newman Hall Room 217A |

|  |  |
|---|---|
| City and County | Jamaica, Queens |
| State and Zip Code | New York 11439 |
| Telephone Number | 718-990-5699 |
| E-mail Address | hurwitj@stjohns.edu |

Defendant No. 8

|  |  |
|---|---|
| Name | Nada Llewellyn |
| Job or Title | Assoc. VP Human Resources, Chief Diversity Officer, and Deputy General Counsel |
| Street Address | 8000 Utopia Parkway = Newman Hall Room 214 |
| City and County | Jamaica, Queens |
| State and Zip Code | New York 11439 |
| Telephone Number | 718-990-6334 |
| E-mail Address | llewelln@stjohns.edu |

Defendant No. 9

|  |  |
|---|---|
| Name | Keaton Wong |
| Job or Title | Director of Equal Opportunity and Compliance |
| Street Address | 8000 Utopia Parkway – University Center |
| City and County | Jamaica, Queens |
| State and Zip Code | New York 11439 |
| Telephone Number | 718-990-2660 |
| E-mail Address | wongk1@stjohns.edu |

Defendant No. 10

|  |  |
|---|---|
| Name | Michelle Cadle |
| Job or Title | EEO Specialist |
| Street Address | 8000 Utopia Parkway – University Center |
| City and County | Jamaica, Queens |
| State and Zip Code | New York 11439 |
| Telephone Number | 718-990-1400 |
| E-mail Address | cadlem@stjohns.edu |

Defendant No. 11

|  |  |
|---|---|
| Name | Danielle Haynes |
| Job or Title | Assoc. Dir. Employee Relations |
| Street Address | 8000 Utopia Parkway– University Center C12 |
| City and County | Jamaica, Queens |
| State and Zip Code | New York 11439 |
| Telephone Number | 718-990-1488 |
| E-mail Address | haynesd1@stjohns.edu |

III.E. Statement of the Facts in my Case

## Background

I am a 73-year old female. I earned my doctoral degree in economics from Rutgers University in 1980. I was hired by Defendant St. John's University to commence employment on September 1, 1980, as an Assistant Professor in the Economics and Finance Department in the the College of Business Administration (now, the Peter J. Tobin College of Business). I was successfully tenured and promoted to Associate Professor in 1985.

I have successfully completed all mandatory classroom observations (for reappointment, promotion, tenure, and Post Tenure Peer Review). My last review occurred in academic year (AY) 2014-2015. I received an Outstanding for my performance and was awarded the maximum monetary award of $2,000. My next review is scheduled for AY 2021-2022.

Commencing July 1, 2018, the University appointed Dr. Charles Clark as the new Chair for the Economics and Finance Department. Since Dr. Clark's appointment, he has done nothing but harass, embarrass, and intimidate me. I have suffered several adverse employment actions which I believe are a direct result of my being an older female professor and as retaliation for filing an age and gender discrimination complaint against him with Human Resources.

Discrimination is not beneath Dr. Clark. He was at the center of an age discrimination controversy back in the mid-2000s, when he served as Associate Dean under former Dean Richard Highfield. Dr. Highfield's goal, as stated in his Strategic Plan, was to hire, reward, and promote "junior journeyman faculty members." Dr. Clark created a "productivity point system" to calculate the alleged scholarly productivity of the faculty members in the business school. The points were then used to allocate research resources (grants and graduate assistants), reduced teaching time for research, and sabbaticals. However, the points were intentionally weighted more heavily toward activities of junior faculty members (who tend to be younger) and dismissed, ignored, or overlooked legitimate scholarly activities of senior faculty members (who are older). Dean Highfield used the "productivity point system" to justify the disparate treatment and, in doing so, forced older professors into voluntarily retiring so that the University did not have to buy them out.

The University has had a difficult time getting older professors to retire voluntarily, without having to offer them buyouts. Its last buyout was in 2014, and Dr. Gempesaw, who was hired in 2015, refuses to offer any. I believe that he encouraged the appointment of Dr. Clark as Chair of the Economics and Finance Department with the malevolent intent of harassing, embarrassing, and intimidating older professors to retire voluntarily without the need to offer buyouts. With the support and cooperation of Dr. Norean Sharpe, the Tobin College Dean, Dr. Clark embarked on a plan to systematically harass, embarrass, and intimidate older professors into voluntarily retiring without the need for a buyout.

## Material Adverse Employment Actions

1)      First discriminatory Article 10.01 action. On October 30, 2018, Dr. Clark sent me an Article 10.01 disciplinary letter to come to a meeting in his office to discuss a complaint from two students, who said that I berated and threatened them over the use of a Team Room. Without ever getting my side of the story, he inflated the complaint to allege that I engaged in "conduct inconsistent with accepted professional and moral standards." I met with Dr. Clark on November 9, 2018. Dr. Joseph Marotta, President of the Faculty Association (FA), attended the meeting. Article 10.01 is reserved for "academic issues." The students' complaint had nothing to do with an academic issue and nothing I did was unprofessional or immoral. On December 10, 2018, I met with Dean Sharpe and Dr. Marotta. Dean Sharpe conceded that I had not threatened the students, but rather that the students felt threatened (and I certainly had not engaged in "conduct inconsistent with accepted professional and moral standards"). At that point, the matter should have been dismissed, but it was not. To resolve the matter, I agreed to apologize, if the documents generated during this bogus Article 10.01 action were destroyed. The University refused.

On December 17, 2018, Associate General Counsel, Joshua Hurwit, Esq., emailed me, saying, the documents would not be destroyed. Instead, he suggested and crafted a memo to be placed in my file to which I could respond. The memo said that I "raised my voice." I refused to entertain it. Even assuming that I had raised my voice, which I do not concede, raising one's voice is not "conduct inconsistent with accepted professional and moral standards." Rather the characterization is gender bias. When a man raises his voice, he is considered to be authoritarian, assertive, showing leadership. When a woman raises her voice, she is considered to be engaged in "conduct inconsistent with professional and moral standards." The memo was discriminatory.

On December 18, 2018, I appealed the actions of Dr. Clark, Dr. Sharpe, and Mr. Hurwit to the Interim Provost, Dr. Simon Møller. In his decision, dated January 9, 2019, Dr. Møller, discriminated against me when he failed and refused to simply dismiss the Article 10.01 based on a non-academic issue, and, instead, wrote that my appeal was premature, because I had not received a written action plan. However, a written action plan was completely unnecessary in my case, because I did nothing wrong. This matter is in limbo and requires immediate resolution. I believe that Drs. Clark, Sharpe, and Møller, and Mr. Hurwit harassed, embarrassed, and intimidated me with this Article 10.01 proceeding, because I am an older female professor.

2)      Second discriminatory Article 10.01 action. On April 16, 2019, Dr. Clark sent me another Article 10.01 disciplinary letter, this time to summon me to his office for a meeting to discuss what he called "low student evaluations and student complaints." Dr. Clark failed to identify any academic issue with regard to either student evaluations or student complaints. This time, I did not meet with Dr. Clark. Instead, I forwarded Dr. Clark's letter to both of our faculty union presidents – Dr. Frank Leveness (AAUP) and Dr. Joseph Marotta (FA) – with my comments expressing opposition to the meeting. A year has passed and I am still awaiting their reply. This matter is similarly in limbo and requires immediate resolution. I believe that Dr. Clark harassed, embarrassed, and intimidated me with this Article 10.01 action, because I am an older female professor.

Dr. Clark could have used other informal non-punitive procedures, but failed and refused to do so. Normally, a Department Chair will tell a student to take up an issue, first, with the professor.

Failing resolution with the professor, the Chair will call or email the professor informally, identify the issue or problem, and ask the professor for his/her side of the story. Expediency in resolving, especially, student complaints is of utmost importance. As Department Chair, Dr. Clark has a duty to resolve student complaints expeditiously. Instead, he warehoused them. Warehousing the complaints and, then, impetuousness commencing an Article 10.01 disciplinary action, without even asking for my side of the story to determine the merits of the incidents, show his true discriminatory animus. Since Article 10.01 was added to the University Statutes (circa 2010), I have never heard of a Department Chair using it for anything. I believe that Dr. Clark harassed, embarrassed, and intimidated me with this Article 10.01 action, because I am an older female professor.

3)      Disparate impact on older professors of alleged "neutral" policy. On February 5, 2019, Dr. Clark sent emails to Dr. Young Back Choi and me, saying, the Dean had asked the Department Chairs to meet with professors who had "low student evaluations." I emailed Dean Sharpe and asked her if she had made the request and she said, "Yes." Through further emails, I learned that she had no objective metrics for which professors would be called into these meetings, but I know, only older professors, who were singled out for such disparate treatment. The professors whom I know were subject to this disparate treatment were Drs. Young Back Choi (late 60s), Anthony Pappas (72 years), Raja Vatti (83 years), Athanasios Vasilopoulos (82 years), and me. Presumably neutral policies that yield discriminatory results must be abandoned and prohibited. I believe that Dr. Clark and Dean Sharpe harassed, embarrassed, and intimidated Drs. Choi, Pappas, Vatti, Vasilopoulos, and me, because we are older professors.

4)      Discriminatory assignment of my preferred summer session class to a younger male professor. On or about April 2, 2019, I noticed in the University's course offerings online that Dr. Clark had assigned Dr. Aleksandr Gevorkyan, a 43-year old male, to teach a summer session course that I requested. I asked Dr. Clark to revise the schedule and assign me to teach the course, pursuant to §§9.10 and 9.11 of the Collective Bargaining Agreement (CBA). He refused. Pursuant to §9.11, a class should be assigned to the more senior professor, when both professors have the qualifications to teach the course and the department has no special needs to deviate from seniority assignment. Dr. Clark violated this provision, because both Dr. Gevorkyan and I have the qualifications to teach the course and the department had no special needs to deviate from seniority assignment. Pursuant to §§9.10 and 9.11, all teaching assignments must be approved by the Department's Personnel and Budget (P&B) Committee. Dr. Clark violated this provision, because he never even notified the P&B Committee members that I had requested to teach the course. I notified the Committee members about the problem, and they requested a meeting with Dr. Clark to approve my assignment. Dr. Clark held two meetings, but nothing was accomplished, because Dr. Clark talked non-stop at the meetings and he refused to allow the P&B Committee members to vote. As a result, Dr. Gevorkyan taught the course and I lost $13,024 as summer session 2019 compensation (1/12th of my annual contract salary, pursuant to §14.06 of the CBA). Other job opportunities were not reasonably available to me. I believe that Dr. Clark treated me differently in the course assignment process and gave the summer session course to Dr. Gevorkyan, rather than me, because I am an older female professor. Since Dr. Clark's action was willful, I am entitled to double damages.

5)      Discriminatory removal of graduate classes from my teaching schedule and assignment to younger male professor. In mid-April, I noticed in the University's course offerings online that two sections of a graduate course, previously assigned to me and approved by the P&B Committee, were missing from my Fall 2019 teaching schedule. I asked Dr. Clark why the sections had been removed and he simply said that "issues have arisen." I asked him what issues, but he refused to say. I asked him to reinstate the sections. He refused. When I queried the P&B Committee members, I learned that Dr. Clark had removed the graduate courses without any consultation or approval from the P&B Committee.

On July 31, 2019, Dr. Clark emailed me, saying, he was giving my graduate classes to a male professor in his 60s (the younger male would have 3 sections of the same graduate course or one preparation for the semester) and he was giving me 3 undergraduate courses (3 different preparations). In his email, he acknowledged that he was making the younger male professor better off (Pareto optimal), while making me, the older female, worse off (Pareto suboptimal).

After 38 years of teaching combinations of graduate and undergraduate classes, Dr. Clark unilaterally, without P&B Committee approval, removed graduate courses from my teaching schedule, gave the graduate classes to a younger male professor, and assigned me only undergraduate courses. I believe that Dr. Clark treated me differently by unilaterally removing these two courses from my Fall 2019 teaching schedule, because I am an older female professor.

6)      Discriminatory assignment of classes to younger professors. At the start of the Fall 2019 semester (September) I learned that Dr. Clark did not change the above male professor's schedule and that he covered the courses that I had selected to teach with a combination of younger professors with lesser credentials: Dr. Juan Chebly (33 years), Dr. Chris O'Kane (38 years), Ms. Tracey L Freiberg (34 years), and Mr. Michael Flaherty (37 years). All but one of these hires plus other adjunct hires are male. Dr. O'Kane is not qualified to teach economics courses as he does not have a doctoral degree in economics. It is in philosophy. Ms. Freiberg and Mr. Flaherty have not yet completed their doctoral degrees. I believe that Dr. Clark treated me differently, because I am an older female professor.

7)      Discriminatory removal and reassignment of classes to younger professors. In addition, I learned from Dr. Ralph Terregrossa (65 years) that Dr. Clark took away his overload course for Spring 2020 and gave it to a 39-year old adjunct, Basel Mansour, who has not yet completed his doctoral degree. Upon information and belief, the P&B Committee did not approve this change. But for the fact that Dr. Terregrossa is an older professor, Dr. Clark would not have pulled the overload course from Dr. Terregrossa's teaching schedule and given it to a younger professor. This is another example of Dr. Clark's harassment, embarrassment, intimidation, and disparate treatment of older professors.

8)      Retaliation and more Age and Gender Discrimination from bogus allegations of statements related to race discrimination.

On April 30, 2019, I filed an age and gender discrimination complaint against Dr. Clark with Human Resources. My case was assigned to Danielle Haynes, Associate Director Employee Relations.

On May 2, 2019, I met with Ms. Haynes. I mentioned that the discrimination may be more systemic and involve Dean Sharpe, Mr. Hurwit, and other administrators, going up the line to the President. I subsequently forwarded additional evidence of discrimination to her.

On May 15, 2019, Michelle Cadle, an EEO Specialist, sent me an email asking me to meet to discuss allegations of statements related to race discrimination. I contacted Dr. Marotta, again, and we agreed to meet with Ms. Cadle on June 11, 2019.

On June 4, 2019, Ms. Cadle sent me a second email, saying, "At our meeting on June 11, 2019, we are also going to discuss the attached, which was brought to our attention recently." The attachment was a 25-page anonymously typed unsigned, unsworn, unauthenticated, unverified, uncertified transcript of an interview that I allegedly gave to a former graduate student, more than six (6) years prior, on March 28, 2013, as partial fulfillment for his grade in a graduate course he was taking with Dr. Kirsten Szylvian in the Master of Public History program.

On June 11, 2019, Dr. Marotta and I met with Ms. Cadle. Mr. Hurwit also attended the meeting. I subsequently learned in January 2020 that Mr. Hurwit recorded the meeting without telling us.

First, Ms. Cadle posited three statements that I allegedly made to students in one of my Spring 2019 classes. The statements turned out to be innocuous. On July 10, 2019, Ms. Cadle sent me a closing letter, finding no evidence of discrimination in the alleged statements. Dr. Clark filed these allegations of race-related statements, and he did so to harass, embarrass, and intimidate me, because I am an older female professor, and as retaliation, because I filed an age and gender discrimination complaint against him.

Second, Ms. Cadle moved to address the transcript. Dr. Clark said that he "found" this transcript on a St. John's website, following a google search, and forwarded it to University Counsel, Joseph Oliva, Esq., and to the Director of Equal Opportunity and Compliance, Dr. Keaton Wong. I acknowledge giving an interview, that was recorded, but I was never given a copy of the recording to review, and I never knew of any transcription. I had never seen the transcript before June 4th, and it was unauthenticated. As a condition of giving the interview, I signed a Deed of Gift in which I turned over all of my rights in the interview to the University. In paragraph 2, the Deed said that the staff may edit the interview. Since I had never reviewed the recording or seen the transcript and was completely unaware of its existence up to that point, I did not know who made it or if anyone had edited it. I asked for authentication. Neither Ms. Cadle nor Mr. Hurwit could authenticate the transcript. I refused to discuss it, without authentication. The meeting ended.

On July 1, 2019, Ms. Haynes sent me a closing letter, saying, she failed to find any evidence of age and gender discrimination in my case. In light of all the evidence I submitted, Ms. Haynes' failure to find any evidence of age and gender discrimination is age and gender discrimination.

On July 2, 2019, Ms. Cadle sent me an email, saying, "we" found the audio file of the interview and the audio file confirms the transcript, "we" sent it along with 2 other documents to your

campus mailbox, and we would like to meet with you on July 15, 2019. She did not identify the documents,[1] and she had not authenticated the audio file.

Professors are 10-month employees. By July, we are on summer break. I sent Ms. Cadle's email to Dr. Marotta, who emailed Ms. Cadle, saying, faculty are not obligated to come to meetings over the summer and that I would meet with her when I returned to campus in September.

Ms. Cadle never replied. Instead, she conducted her own "investigation" on an unauthenticated transcript, in my absence and without my input. On July 17, 2019, she sent me a closing letter, saying, she found enough evidence that I had made "offensive" (not discriminatory) statements "about" (not to) St. John's students in violation of an anti-bias, anti-discrimination policy (#704), which was adopted more than 5 years AFTER the date on the transcript. Her conclusion was completely inconsistent with the content of the University's own policy. She failed to support her conclusion with evidence of any alleged statements. I believe that Dr. Clark's allegations and Ms. Cadle's bogus investigation were age and gender discrimination, because I am an older female professor, and retaliation, because I filed an age and gender discrimination complaint against Dr. Clark and implicated senior administrators, whom Ms. Cadle may have been directed to protect.

Ms. Cadle forwarded my file to Dean Sharpe "for further handling." Dean Sharpe arbitrarily extracted what she identified as 4 sets of statements from the unauthenticated transcript, ascribed the statements to me, and, on July 30, 2019, while I was on summer break, she sent a letter to the President requesting that he bring an Article 10 disciplinary charge against me for alleged "conduct inconsistent with accepted professional and moral standards." I believe that the commencement of this Article 10 proceeding was age and gender discrimination by Dean Sharpe, because I am an older female professor, and retaliation by Dean Sharpe, because I filed an age and gender discrimination complaint against Dr. Clark and implicated her.

Pursuant to the University Statutes, the President should have met with me to attempt a resolution. He never did. Instead, on August 7, 2019, while I was still on summer break, President Gempesaw sent me a letter "relieving me of my teaching and service duties with pay pending a full investigation of the matter." The suspension was completely unwarranted. The charge has nothing to do with either my teaching or service duties. A professor is removed from the classroom only when s/he is a threat to others. At 5.0' I was not a threat to anyone and the President had no reason to believe that I was. I believe that this suspension by President Gempesaw was motivated by discrimination, because I am an older female professor, and he wanted me to voluntarily retire without a buyout, and by retaliation, because I filed an age and gender discrimination complaint against Dr. Clark and implicated him.

On August 8, 2019, while I was still on summer break, Joseph Oliva, Esq., acting as the President's designee, forwarded Dean Sharpe's Article 10 disciplinary charge to the Committee on Investigation and Advice of Charges Against a Faculty Member (the "Investigation Committee"). The Investigation Committee is composed of 5 duly elected faculty members and

---

[1] I learned in September when I returned to school and picked up my mail that one document was the executed Deed of Gift and the other was a picture of me.

is supposed to be an independent, impartial, completely neutral body. Its role is to investigate and resolve the charge(s). However, Mr. Oliva hamstrung the Investigation Committee, when he (President Gempesaw's designee) accepted assignment from the Board of Trustees to be the Committee's legal adviser. As an attorney, he knew or should have known that this appointment created a major conflict of interest for him. The Investigation Committee subsequently noted in its Final Report and Recommendations (the "Report") that he strategically withheld important information from the Committee as a result of this dual appointment. *See below.* Mr. Oliva now became complicit with the other administrators in their attempt to terminate me and thereby Mr. Oliva participated in their age and gender discrimination and retaliation of me.

On October 28, 2019, the Investigation Committee submitted its Report to the President. The President failed and refused to share it with me. It is now May 2020 and the President has failed and refused to share the Report with me. Upon learning from me in mid-December that the President refused to share the Report with me, the Investigation Committee sent me a copy on December 23, 2019. However, because of the holidays, I did not read it until January 19, 2020.

The Report completely vindicated and exonerated me! The Committee found three things: (1) the University failed to supervise Dr. Kirsten Szylvian and her colleagues, who created the St. John's Oral History Project, but failed to implement the "best practices" of the Oral History Association, and uploaded personal interviews to the internet without appropriate protections for interviewers and interviewees; (2) the University violated my academic freedom by filing bogus charges against my ability to speak freely about the University; and (3) no statements alleged from the transcript were improper. The Report noted how Mr. Oliva was unable to help with the Committee's investigation as the President's designee, because he was also assigned to be the Committee's legal adviser and so the Committee could not identify the "whistleblower" or determine his/her motives for filing the bogus race discrimination allegations against me. The Report recommended unconditionally and without qualification that the President withdraw the charges and lift the suspension immediately.

It is now May 2020, more than six (6) months later, and the President has failed and refused to act on the Committee's recommendations. Instead, the President is seeking a resolution that contains red herrings not even contemplated by the Committee. The President continues to discriminate against me, because I am an older female professor, and to retaliate against me because I filed an age and gender discrimination complaint against Dr. Clark and implicated him.

The President failed and refused to timely resolve the charges and lift the suspension from my teaching duties. The President's failure substantially changed the terms and conditions of my employment and caused me money harm. My principal duty is to teach. The President is preventing me from doing what I was hired to do and I am now out of the loop for course assignments for summer session and fall 2020. I will lose another summer session stipend, this time as a result of the suspension. My money damages will be a minimum of $13,024, plus any salary increases for AY 2019-2020 (1/12th of my annual contract salary, pursuant to §14.06 of the CBA). Other job opportunities will not be reasonably available to me. Dr. Gempesaw's refusal to resolve the charges and lift the suspension on a timely basis on reasonable terms so that I can teach is willful, so that I am entitled to double damages. Dr. Clark has also assigned away all of my preferred courses for Fall 2020, including the graduate courses.

The President failed and refused to timely resolve the charges and lift the suspension from my service duties. The President's failure substantially changed the terms and conditions of my employment. Approximately one third of faculty duties is to participate in governance – attend meetings, speak up, and vote. I have completely lost my ability to participate in faculty governance, because I have not been allowed to attend, participate in, or vote at Department or Faculty Council meetings. I was duly elected by the faculty as a representative to the University Senate and the Department's Personnel and Budget Committee. I am being denied the ability to exercise these elected appointments. I have not been allowed to attend those meetings, to speak up, or to vote. Dr. Gempesaw's refusal to resolve the charges and lift the suspension on a timely basis on reasonable terms so that I can serve is willful.

The suspension has brought humiliation, embarrassment, and shame. My colleagues want to know where I am. They have heard rumors that the University has brought me up on disciplinary charges. The immediate reaction is, What did I do? What did I do? Nothing, but the University has failed and refused to withdraw the charges, lift the suspension, and dispel rumors.

The University has unfairly and discriminatorily punished me for voluntarily helping a student to fulfill the requirements for one of his courses in a graduate program, and it has done nothing to punish Dr. Szylvian or her colleagues for their culpability with regard to the Oral History Project. Dr. Szylvian is about 58 years old.

President Gempesaw, et al., discriminated against me, because I am an older female professor and retaliated against me, because I filed an age and gender discrimination complaint against Dr. Clark and implicated him.

9)      Age and Gender Discrimination and Retaliation for filing a complaint against the EEO Specialist I filed a complaint against Ms. Cadle for her failure to follow statutory and contractual procedures established in the CBA and the University's own policies. My complaint was, first, denied by Mr. Oliva, on behalf of Dr. Wong, who was on maternity leave (another conflict of interest for Mr. Oliva), and, on appeal, by Nada Llewellyn, Associate Vice President of Human Resources, on non-responsive grounds. They are simply covering up for their own ineptitude and discriminatory failure to sanction Ms. Cadle for her improper investigation and to stop this age and gender discrimination and retaliation of me from going further.

The discriminatory animus against me is systematic and pervasive. Several members of the Administration are complicit: Dr. Clark, Dr. Sharpe, Dr. Møller, and Dr. Gempesaw. Now, Mr. Oliva, Mr. Hurwit, and Ms. Llewellyn have unethically closed ranks to cover-up what we know now from the Investigation Committee was a deeply flawed investigation by Ms. Cadle, and, now, they are all covering up for Dr. Clark, Dean Sharpe, Dr. Møller, President Gempesaw, Dr. Wong, and Ms. Haynes! The Article 10 charge and my suspension are also retaliation against me for having filed an age and gender discrimination complaint against Dr. Clark and senior administrators, including the President. I have never heard of any faculty member being treated so harshly for no legitimate reason.

10) Retaliation for Filing an Age and Gender Discrimination and Retaliation Lawsuit against the University and Several of its Administrator

In late January, 2020, the Investigation Committee commenced what I believe was supposed to be a consultative process with the President and me to resolve the Article 10 charges. Several drafts of a resolution agreement exchange hands through the Investigation Committee. On March 4, 2020, the consultative process came to an abrupt halt. I submitted a counter proposal to the Investigation Committee to give to the President, and, thereafter, I heard nothing. I was just left hanging in limbo.

On March 4, 2020, I also received my 90-day Right to Sue letter from EEOC. I filed my age and gender discrimination complaint with the Pro Se Office of the United States District Court in Brooklyn on May 26, 2020. I received the official summons and complaint from the US District Court Pro Se Office on June 8, 2020. Service on the Defendants was completed on August 25, 2020.

Just one month after service of my age and gender discrimination lawsuit, the University retaliated against me for commencing my lawsuit. On September 24, 2020, Mr. Oliva sent me a letter in which he declared that the "process undertaken by the Committee on Investigation and Advice of Charges Against a Faculty Member failed to yield a mutually satisfactory result" and that "formal written charges" against me were being presented to the Committee on Hearing and Deciding of Charges Against a Faculty Member. He advised me that I had 20 days to file a written answer and to let him know if I wanted a hearing. Mr. Oliva's letter contained no "formal written charges."

Mr. Oliva attached several documents to his letter, including a 2-page document, entitled "Discriminatory Charges Against Professor Arlene Joyce Furfero," a redacted copy of the Investigation Committee's Report, minutes from the Investigation Committee's meetings, the unauthenticated transcript of an interview that I allegedly gave on March 28, 2013, the interview release agreement, Michelle Cadle's letter, dated, July 17, 2019, and the original charges against me that Dr. Gempesaw preferred on behalf of Dean Sharpe. None of these documents contained "formal written charges."

The 2-page document, entitled "Discriminatory Charges Against Professor Arlene Joyce Furfero," was anonymously typed, unsigned, unsworn, undated, and unauthenticated. It contained a one-paragraph introduction, four (4) paragraphs of procedural history, and a one-paragraph conclusion. The introduction says: "Pursuant to Article 10 of the University Statues, the following constitute disciplinary charges against Professor Arlene Joyce Furfero…," but the paragraph contains no charge(s). The conclusion says: "Pursuant to Article 10.06(e) of the University Statutes, the President now presents the Charges against Professor Furfero to the Committee on Hearing and Deciding Charges Against a Faculty Member. The charges were formulated with the assistance of the Investigation Committee, including the Investigation Committee Report (see Attachment A)," but the paragraph contains no charge(s). The paragraphs on "procedural history" contain no charge(s). In short, the document that purports to be "Discriminatory Charges Against Professor Arlene Joyce Furfero" contains no charge(s).

The 2-page anonymously typed, unsigned, unsworn, undated, and unauthenticated document references an Attachment A, but there is no Attachment A *per se*. The remaining documents are not labeled. The next document in sequence is the Investigation Committee's Report, but the Investigation Committee's Report contains no charges. As previously stated, the Investigation Committee's Report completely exonerates me and recommends that the President lift the suspension and reinstate me. *See supra*, p. 15, ¶2 (#8). Moreover, the Investigation Committee's Report cannot serve as a predicate for any charge(s) or as a substitute for the Investigation Committee's assistance to the President in formulating any charge(s), because the Investigation Committee's Report was written solely by the members of the Investigation Committee, not the President, and the Investigation Committee's Report was written and submitted to the President prior to any attempt at resolution. In short, the Investigation Committee's Report contains no charge(s) against me. *See supra*, p. 15, ¶2 (#8).

Despite the fact that Mr. Oliva's letter and the 2-page anonymously typed, unsigned, unsworn, undated unauthenticated document allude to "formal written charges," but they set forth none.

Neither Mr. Oliva's letter nor any of the documents attached to his letter contain any charge(s) that were properly formulated by the President with assistance of the Investigation Committee, pursuant to Section 10.06(e) of the University Statutes. Mr. Oliva's unilateral removal of my Article 10 case from the Investigation and Advice stage (Step I) to the Hearing and Deciding stage (Step II) without any formal written charge(s), pursuant to Section 10.06(e) of the University Statutes, was retaliation against me, because the University and several administrators, including Mr. Oliva, had just been served with complaints in my federal court lawsuit for age and gender discrimination against them.

I hired an attorney to speak with Mr. Oliva about the missing charge(s). Mr. Oliva initially extended the response deadline, but then set a final response deadline of November 11, 2020, and told my attorney to let him know if I wanted a hearing. My attorney asked Mr. Oliva if he would extend the deadline, pending a court-ordered mediation in my EEO lawsuit on February 2, 2021, and Mr. Oliva wrote back, "No," and he demanded a response by November 13, 2020.

On November 10, 2020, my attorney submitted a response on my behalf to Mr. Oliva, noting, among other things, that the notice of removal to the Hearing and Deciding level contained no charges against me. My attorney timely indicated that I wanted a hearing and included a Bill of Particulars to clarify the charges. According to the University Statues, "If a hearing is requested, the [Hearing and Deciding] Committee shall schedule a hearing within thirty (30) days of receipt of the written request for a hearing and shall notify the faculty member of the date, time and place for the hearing." The deadline for a hearing was December 9, 2020. December 9th passed and neither my attorney nor I were contacted about any hearing. The University has also failed to respond to my attorney's Bill of Particulars. I was once again left hanging in limbo.

On Friday, February 19, 2021 – 101 days later, Mr. Oliva sent a letter to my attorney. He wrote that the Hearing and Deciding Committee wanted him and outside counsel, Lyle Zuckerman, Esq., to exchange witness lists and document requests by February 24, 2021. Five (5) days' notice, two of which were weekend days!

On Monday, February 22, 2021, my attorney replied to Mr. Oliva. He objected to lack of timeliness and insufficient time to comply and again challenged the existence of charges against me and requested answers to his response and bill of particulars and a clear and concise statement of the charge(s) signed and dated by the President and the members of the Investigation Committee.

Mr. Oliva replied, saying that this internal hearing is not a court proceeding and that my attorney was not entitled to any of his requests. Mr. Oliva's reply completely side-stepped the key issue, namely, that the University had not posited any properly formulated charges against me. In fact, it had posited NO charges against me.

On February 23, 2021, my attorney received an unsolicited letter from Mr. Zuckerman. Mr. Zuckerman acknowledged that the University has no properly formulated charge(s) against me. He wrote that the Investigation Committee refused to assist the President in formulating any charge(s) against me! Nonetheless, Mr. Oliva insists on moving forward with this charade of a hearing on charges that do not exist.

At this point, Mr. Oliva appears to be the culpable defendant, who is retaliating against me, because I filed an age and gender discrimination lawsuit against him and 10 other University Defendants in United States District Court, but I do not know with what other Defendants he is collaborating. What I do know is that none of the Defendants has ever had any legitimate business reason(s) for concluding that I made offensive statements about St. John's students in violation of a post-dated, anti-bias policy, for bringing me up on Article 10 disciplinary charges, for suspending me, for unilaterally moving my case to hearing and deciding absent any charges after the Investigation Committee completely vindicated me, and, in short, for destroying my reputation and credibility as a professor. They have retaliated against me solely because I am an older female and exercised my rights to file an in-house complaint and an external lawsuit against Defendants.

11) Age Discrimination

In its Final Report and Recommendations, the Investigation Committee excoriated and castigated the University for allowing Dr. Kirstin Szylvian and her colleagues to organize the St. John's Oral History Project and upload what are basically private interviews to a public webpage on St. John's website without using the best practices of the Oral History Association which left me vulnerable to the very kind of treatment I am receiving. While the University was quick to suspend me and continues my suspension despite complete vindication by the Investigation Committee, it still has done nothing to punish Dr, Szylvian, the professor who published a transcript of my purported March 28, 2013 interview to a St. John's website and made it public. Upon information and belief, Dr. Szylvian is about 15 years my junior and was about 51 at the time of my interview and about 57 at the time of my punishment. I was 66 and 72, respectively. The only reason I am still on suspension on Article 10 disciplinary charges, and Dr. Szylvian is not, is because I am an older female, who filed an age and gender discrimination complaint against my Department Chair and key University administrators up to the President. The University is engaged in pervasive age and gender discrimination and retaliation against me because I am an older female, who filed an age and gender discrimination complaint against my

Department Chair and key University administrators up to the President and now an age and gender discrimination and retaliation lawsuit against the Defendants in US District Court.

12) <u>Discrimination, Disparate Impact, and Hostile Work Environment</u>

The University not only condones, but also actively sanctions policies that discriminate against and have a disparate impact on older professors and foster a hostile work environment for them. By allowing decisions and the adoption of policies that flip seniority, the University discriminates against older professors who have worked all their lives for these benefits.

The St. John's faculty members are unionized. At St. John's, like other unionized workplaces, seniority and age are highly correlated. What may appear to be a breach of the Collective Bargaining Agreement may in fact be discrimination against older professors. While allegations of a breach of contact must be pursued through contractual grievance channels, allegations of discrimination and retaliation are pursued through the Human Resource Department, the Equal Employment Office, and the courts.

Like most union contracts, seniority has its perks. Professors gain more benefits as they gain seniority, and they grow older as they gain seniority. Older professors, by virtue of their longevity of service, accrue more seniority and, hence, more benefits or perks. Seniority is objectively fair, because younger professors eventually become older professors and receive the benefits of seniority when they grow older and attain seniority.

Since Dr. Clark became Chair in July 2018, he has made several decisions and adopted policies that appear neutral on their face, because they attack seniority, but discriminate against and have a disparate impact on older professors. Dr. Clark has created a hostile work environment for older professors in the Economics and Finance Department with his policies. The Business School Dean, Dr. Sharpe, the Provost, Dr. Møller, and the President, Dr. Gempesaw have supported Dr. Clark's decisions and policies.

I am the oldest and most senior professor in the Economics and Finance Department. Dr. Clark's decisions and policies most directly adversely affect me. Dean Sharpe, Dr. Møller, and the President promote this discrimination, disparate impact, and hostile work environment, because they have denied my grievances and appeals against Dr. Clark.

First, Dr. Clark re-interpreted certain contract terms to favor younger professors at the expense of older professors to deny older professors the benefits to which they are entitled as a result of growing old and gaining seniority. The contact terms in question are from section 9.11 of the Collective Bargaining Agreement, entitled <u>Criteria for Course Assignment</u>:

> "In making course assignments for any academic session, the Department Chairperson with the approval of the Department Personnel and Budget Committee, shall consider: 1) the qualifications of the faculty member to teach the course; 2) the needs of the department, and 3) those things being equal, the seniority of the faculty members who have indicated interest in teaching the course."

In the first instance, in summer 2019, Dr. Clark assigned a summer session course, that I normally would have taught, to a male professor 30+ years younger than I. *See supra*, p. 11, ¶2 (#4). The contract provision at issue was *"1) the qualifications of the faculty member to teach the course."* Traditionally, "qualifications" meant qualifications in field, i.e., professors with economics qualifications taught economics courses and professors with finance qualifications taught finance courses. Dr. Clark, however, re-interpreted the provision to mean the professor with the best or most qualifications and, since Dr. Gevorkyan had just come up for tenure and had more recent publications, Dr. Clark assigned the course to him rather than to me. If best or most qualifications was intended, then the Chair and P&B Committee never have to reach seniority. The intent and practical effect of Dr. Clark's re-interpretation is to render section 9.11(3) and seniority, and, consequently, older professors, meaningless. Dr. Clark's interpretation is contrary to past interpretation, but he prevailed and his re-interpretation discriminated against me, the older professor, and I lost the summer course assignment and the stipend.

In the second instance, in September 2020, Dr. Clark proposed, and the P&B Committee voted, on "2) needs of the department" to mean "fairness." Traditionally, "needs of the department" was ministerial and meant the need to staff all courses on all campuses at all days and times for all programs. Dr. Clark's re-interpretation as "fairness" was to mean some convoluted rotation scheme which could squeeze older professors out of summer session courses, if they do not teach in a given summer for a reason other than an insufficient number of courses to accommodate all who wanted to teach a course. For example, Dr. Clark also controls course offerings, which allows him to schedule classes at inconvenient times, on inconvenient campuses, or during an inconvenient session.[2] The policy also eliminates "bumping," a key tenet of seniority, which allows Dr. Clark to assign an older professor to a course which he knows will cancel for insufficient enrollment. The intent and practical effect of the new summer course assignment policy is to render section 9.11(3) and seniority, and, consequently, older professors, meaningless. Dr. Clark's interpretation has a disparate impact on older professors and creates a hostile work environment for them.

Six of the oldest professors (one female and 5 minority males) from the department filed a grievance against Dr. Clark, as Department Chair, for adopting the new policy. (As the oldest and most senior professor and only female economist in the department, I would have signed the grievance, except that I did not want to taint the grievance or dilute its impact with irrelevant tangencies, because I am still on suspension.) Dr. Clark side-stepped a response to the grievance, so the professors had a right, pursuant to the Collective Bargaining Agreement, to take their grievance to the next level. They appealed to the Dean Sharpe, but she denied their appeal.

In December 2020, Dr. Clark and the P&B Committee voted to reinterpret their reinterpretation of "needs of the department" ("fairness") as "equitable treatment of all faculty." But equitable on

---

[2] Something similar already happened. In summer 2019, Dr. Clark cheated Dr. Therese Pactwa out of a summer session course, when he scheduled a course that she would normally teach from online to the Queens campus to discourage Dr. Pactwa and give the course to a younger professor. Dr. Pactwa usually teaches on the Staten Island Campus, not the Queens campus, as it is quite a distance from her home in Central New Jersey.

what grounds? And by whose standards? Dr. Clark gave no details. Since "equitable treatment" is vague, amorphous, and remains undefined in both abstract terms and application, the grieving professors have decided, for the time being, to wait and see how Dr. Clark applies "equitable treatment" in the course assignment process. However, no doubt remains in my mind or in the minds of the six professors who grieved Dr. Clark's first attempt to reinterpret "needs of the department" as "fairness" that his latest attempt is also designed to discriminate against older professors, to have a disparate impact on older professors, and to create a hostile work environment for older professors. Since the course assignment process is already equitable on a seniority basis, Dr. Clark's definition of equitable would have to be some other non-senior basis which would, by definition, discriminate against older professors.

Second, as the oldest and most senior professor I would normally get first pick of courses to teach. However, even if I were to return to the faculty, I would be hard-pressed to select preferred courses to teach and would be stuck teaching unwanted courses, despite my age, experience, and seniority, because Dr. Clark has withdrawn standard, mainstream economics courses from the Course Offerings per semester and replaced them with novelty or non-traditional economics courses. These courses are outside of my specializations within the field of economics and, although I could easily learn to teach them, because all economics courses use the same tools and logic, Dr. Clark could use the excuse that he adopted in 2019 to deny me a summer session course, namely, that my qualifications to teach the course are inferior to another professor's qualifications. For someone with 45+ years of teaching experience, I would be denied summer session courses and relegated to teach unwanted courses during the fall and spring semesters. Dr. Clark has intentionally replaced courses that I regularly teach with courses that I have not taught, because I am an older female, who filed an in-house age and gender discrimination complaint and, now, an external age and gender discrimination lawsuit against him. He arbitrarily removed graduate courses from my teaching schedule in Fall 2019, which removal constitutes a material adverse change in my working conditions. He is currently in the process of removing courses that I would ordinarily teach from the list of economics electives that finance majors can take. He is engaged in pervasive age and gender discrimination and retaliation against me, his intentional revision of course offerings has or will have a disparate impact on me, and he has created a hostile work environment for me when I return to the faculty, because I am an older female, who filed an in-house age and gender discrimination complaint and an external lawsuit against him.

V. Relief

1)      I want money damages of $13,024 to compensate me for the loss of my summer session 2019 course, because Dr. Clark assigned it to a younger male professor, plus double damages for Dr. Clark's willfulness for intentionally making the discriminatory course assignment.

2)      I want money damages of $13,024, plus any contractual salary increases for AY 2019-2020, to compensate me for the loss of my summer session 2020 course (and future summer session courses), because President Gempesaw failed and refused to timely withdraw the Article 10 charges and lift my suspension, plus double damages for President Gempesaw's willfulness for intentionally failing and refusing to timely withdraw the Article 10 charges and lift my suspension.

3)      I want an injunction against all of the Defendants – President Dr. Conrado "Bobby" Gempesaw, Provost Dr. Simon Møller, Dean Dr. Norean Sharpe, Department Chair Dr. Charles Clark, Joseph Oliva, Joshua Hurwit, Nada Llewellyn, Dr. Keaton Wong, Ms. Michelle Cadle, and Ms. Danielle Haynes – enjoining them from further engaging in discrimination and retaliation against me.

4)      I want an injunction against all of the Defendants enjoining them from further acting individually and in consort with one another to discriminate against older professors and female professors.

5)      I want all of the Defendants to be directed to take sensitivity training for age and gender bias and discrimination.

6)      I want the bogus Article 10 proceeding against me terminated immediately, with prejudice. I want the Article 10 charge to be withdrawn, the suspension to be lifted, my faculty position to be restored with all rights and privileges, my committee assignments restored, President Gempesaw to send me a formal written apology for his failure to reinstate me back in November 2019 after the Investigation Committee recommended such in its Final Report and Recommendations to him, Dean Sharpe to send me a formal written apology for filing the baseless Article 10 charge against me, Mr. Oliva to send me a formal written apology for intentionally obstructing the Investigation Committee's investigation, for assuming roles with conflicts of interest, and for frivolously moving my Article 10 proceeding to the Hearing and Deciding Committee without any recognizable disciplinary charge, and the University to be directed to destroy any and all documents generated during the Article 10 proceeding, except for the Investigation Committee Report.

7)      I want the frivolous allegation(s) of racial discrimination by Dr. Clark, which allegation(s) led to the phony investigation and erroneous conclusion by Ms. Cadle that underlies the Article 10 charge to be dismissed, terminated, and withdrawn with prejudice, Dr. Clark to send me a formal written apology for filing frivolous claim(s), Ms. Cadle and Mr. Hurwit to send me formal written apologies for having engaged in unethical and improper employment practices in contravention of established University policies, Mr. Oliva and Ms. Llewellyn to send me formal written apologies for intentionally failing to discipline Ms. Cadle, and the University to

be directed to destroy any and all documents generated during Ms. Cadle's frivolous investigation.

8)      I want the two Article 10.01 letters from Dr. Clark withdrawn, Dr. Clark's allegations and complaints against me terminated with prejudice, Dr. Clark, Dean Sharp, and Mr. Hurwit to send me formal written apologies for discriminating against me because of my age and gender, and the University to be directed to destroy any and all documents generated during these bogus Article 10.01 actions, including Mr. Hurwit's discriminatory memo.

9)      I want an injunction against Dr. Clark and Dean Sharpe enjoining them from issuing Article 10.01 disciplinary letters, unless the letter explicitly identifies "an academic issue concerning a faculty member's teaching, research and scholarship, or service responsibilities (as set for in Article 9 of the Collective Bargaining Agreement)."

10)      I want an injunction against Dr. Clark and Dean Sharpe enjoining them from using student evaluations as bases for Article 10.01 disciplinary actions, where the Collective Bargaining Agreement and the University Statues intend for them to be used solely for faculty development, not discipline.

11)      I want an injunction against Dr. Clark and Dean Sharpe enjoining them from using student complaints as bases for Article 10.01 disciplinary actions, unless the letter adequately identifies the "academic issue" in the student complaint.

12)      I want an injunction against Dean Sharpe enjoining her from issuing or allowing Department Chairs to issue Article 10.01 letters, unless she has previously published well-defined metrics of issues for which Article 10.01 disciplinary letters may be sent, and she must also publish a list of names of faculty members who are receiving Article 10.01 disciplinary letters based on the metrics and the metric for which the Article 10.01 letter is being sent, and she shall only draft written action plans that are narrowly tailored to correct specific identifiable academic issues.

13)      I want Dr. Clark to assign me to my requested course preferences, as per §§ 9.10 and 9.11 of the Collective Bargaining Agreement, and to restore graduate courses to my teaching schedules, now (for summer session and fall 2020) and in the future, as long as he is Department Chair.

14)      In the future, I want my seniority in the department to be respected, courses in my areas of specialization to be offered to the students each semester, my course preferences to be honored without objection, and all of my courses to be delivered online; the Provost shall be directed to supervise Dr. Clark's (and all future Chair's) selections of course offerings per semester and summer session and assignment of courses for my teaching schedules.

15)      I want to be restored to my duly elected positions on the University Senate, the Budget subcommittee of the University Senate, and the Economics and Finance Department Personnel and Budget Committee and to serve my full 3-year terms on each.

16)      I want the University to reimburse me for my attorney fees and legal expenses that I had to pay to defend against the bogus Article 10 proceeding.

17)      In lieu of reinstatement, I would ask for monetary compensation equal to 5 years of salary ($156,292.56 x 5 = $781,462.80), 5 years' contribution to my TIAA-CREF account at 10% of my salary ($78,146.28), 5 summer session course stipends, doubled as punitive damages for intentional discrimination ($13,024.00 x 5 x 2 = $130,240), and 5 years of medical insurance premiums. The total damages are $989,849.08, plus medical insurance premiums, plus my attorney fees and legal expenses, in addition to full withdrawal with prejudice of any and all disciplinary cases pending against me and destruction of any and all documents generated in these cases, any and all rights associated with voluntary retirement from the University, pursuant to the Collective Bargaining Agreement and the University Statutes, and the title of Professor Emeritus bestowed on me.