| UNITED STATES DISTRICT COURT | | C/M |
| EASTERN DISTRICT OF NEW YORK | | |

---------------------------------------------------------- X

ARLENE JOYCE FURFERO,

       Plaintiff,

   - against -

ST. JOHN'S UNIVERSITY, *et al*.,

       Defendants.

**MEMORANDUM DECISION AND ORDER**

20-cv-2395 (BMC) (LB)

---------------------------------------------------------- X

**COGAN**, District Judge.

  Plaintiff *pro se* brings this employment discrimination action under Title VII, the Age Discrimination in Employment Act, and corresponding provisions of state law, alleging that she has been discriminated against, subjected to a hostile work environment, and retaliated against by her employer, defendant St. John's University, and ten administrators because of her age (73) and gender (female). It is before me on defendants' motion to dismiss the amended complaint. The issue is whether she has alleged sufficient facts to raise a plausible inference that the things that happened to her that she doesn't like resulted from an animus that defendants have against her based on her age or gender. The motion is granted in part and denied in part for the reasons set forth below.[1]

---

[1] I reject plaintiff's argument that because defendants chose to answer her original complaint, they have waived their right to seek dismissal of her amended complaint. See Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994).

**SUMMARY OF AMENDED COMPLAINT**

Plaintiff's single-spaced, 25-page amended complaint alleges that she has been teaching at St. John's University since 1980 in the Economics and Finance Department of the College of Business Administration, becoming a tenured Associate Professor in 1985. Most of the paragraphs in the amended complaint (like its predecessor) are unnumbered, but under the heading "Material Adverse Employment Actions," plaintiff has alleged twelve numbered claims of alleged mistreatment that she thinks were based on her age, gender, or retaliation for complaints about her mistreatment. Each of these twelve claims will be discussed below.

**DISCUSSION**

**I.** **Standard of Review**

To survive a motion to dismiss under Rule 12(b)(6), a pleading must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (internal quotation marks and citations omitted). Said otherwise, plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

In conducting the above analysis, the Court must accept as true all the well-pled allegations contained in the complaint. Iqbal, 556 U.S. at 678. But this tenet "is inapplicable to

legal conclusions." Id. "[D]etailed factual allegations" are not required, but "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at 555). "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 678-79.

Where, as here, there is no direct evidence of discrimination, a plaintiff's Title VII and ADEA claims "must be plausibly supported by facts alleged in the complaint [] that the plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent." Littlejohn v. City of New York, 795 F.3d 297, 311 (2d Cir. 2015). To be clear, plaintiff need not at this stage allege facts that "give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination"; she must only plead facts that "give plausible support to a minimal inference of discriminatory motivation." Id.; see also Polanco v. City of New York, No. 16-cv-09196, 2018 WL 3178225, at *4 (S.D.N.Y. June 27, 2018) ("Although an employment discrimination plaintiff need not plead a *prima facie* case of discrimination in order to survive a motion to dismiss, a plaintiff must allege sufficient facts showing that [she] is entitled to relief.") (quoting Bermudez v. City of New York, 783 F. Supp. 2d 560, 575 (S.D.N.Y. 2011)) (cleaned up).

Ordinarily, "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (internal quotation marks and citations omitted); see also Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009). Such pleadings are "to be liberally construed," Ahlers v. Rabinowitz, 684 F.3d 53, 60 (2d Cir. 2012), and interpreted "to raise the strongest arguments that they suggest," Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996). In the instant case, however, the special solicitude to

which a *pro se* plaintiff is normally entitled is tempered by the fact that plaintiff is an attorney. See Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 86 n.4 (2d Cir. 2001) ("We note, however, that *pro se* attorneys such as [the plaintiff] typically 'cannot claim the special consideration which the courts customarily grant to *pro se* parties.'") (quoting Harbulak v. County of Suffolk, 654 F.2d 194, 198 (2d Cir. 1981)). The Second Circuit has suggested that the amount of solicitude to which a *pro se* plaintiff-attorney is entitled, if any, may vary from case to case. See Tracy v. Freshwater, 623 F.3d 90, 102 (2d Cir. 2010) ("[T]he appropriate degree of special solicitude is not identical with regard to all *pro se* litigants.").

Here, defendants assert that plaintiff is not entitled to leeway in drafting her pleadings, relying on Finn v. Anderson, 592 F. App'x 16, 20 (2d Cir. 2014) ("While a court is ordinarily obligated to afford a special solicitude to *pro se* litigants in construing their pleadings, *pro se* attorneys typically cannot claim that special consideration.") (internal quotation marks and citations omitted). They note that plaintiff is a licensed attorney who represents litigants in both federal and state court. See King v. Marco Eugene Trucking Company, No. 98-cv-5077, 2002 WL 32096574 (E.D.N.Y. Feb. 15, 2002) (representing a defendant trucking company in a dispute over employee benefit fund contributions); Obi v. Amoa, 58 Misc. 3d 446, 63 N.Y.S.3d 208 (Sup. Ct. Kings Co. 2017) (representing the plaintiff, a college professor, in a tort action against six named defendants).

Plaintiff responds that she is inexperienced in litigation. She received her economics degree in 1980, but her law degree in 1996. She describes her legal practice as a "small, part-time solo practice out of her house." Her practice is mostly transactional and she has no secretarial or clerical help. Most of her litigation practice is in the state courts, and the King case cited above was her last appearance in federal court. She has been involved in three employment

4

discrimination lawsuits against the University previously, but hired counsel to represent her in each.

As to the degree of solicitude, if any, to which plaintiff is entitled, I think plaintiff's practice and experience as a lawyer is not as probative as the papers she has submitted in this case. Both her pleadings and her opposition to defendants' motion are only marginally more professional than employment discrimination pleadings and submissions that the average non-lawyer, *pro se* litigant submits in this district. As is typical of *pro se* employment discrimination cases, the amended complaint is more of a diatribe than a legal pleading, and accuses everyone who did something she didn't like of harboring a discriminatory intent.

Her submissions suggest that plaintiff does not have much familiarity with federal civil procedure or employment discrimination law. I am therefore inclined to review them the same way that *pro se* papers are reviewed, in the manner Iqbal suggests. See Hogan v. Fischer, 738 F.3d 509, 515 (2d Cir. 2013) (even "a *pro se* complaint must state a plausible claim for relief"). That is, the Court must disregard argument and innuendo, and attempt to separate out factual allegations from plaintiff's personal feelings and beliefs. That requires a high level of indulgence, even if not precisely the same amount that a non-lawyer *pro se* litigant would receive.

**II.    Analysis of Each Claim for Relief**

The amended complaint is very long on argument, characterizations, and conclusions, but very short on factual allegations. As noted above, in analyzing the claims below, I have disregarded plaintiff's beliefs and conclusions, as required under a Rule 12(b)(6) analysis. See Iqbal, 556 U.S. at 678. The subheadings below are taken *verbatim* from the amended complaint.

To the extent some of these claims do not cross the line from possibility to probability, I am not ruling that plaintiff will be precluded from offering evidence of some of the facts alleged in these claims as evidence of intent as to other claims that do survive. I am dismissing the insufficient claims solely because they do not provide a discrete basis for recovery.

  A.  **First Claim: "First discriminatory Article 10.01 action"**

This claim arises out of a disciplinary letter sent to plaintiff by defendant Dr. Charles Clark. Two students had accused plaintiff of "berat[ing]" and "threaten[ing]" them over the use of a room. The claim alleges that Dr. Clark, based on these complaints, and without hearing plaintiff's side of the story, found her to have engaged in "conduct inconsistent with accepted professional and moral standards." Plaintiff does not believe that the violation of such standards is an "academic issue" as defined in Article 10.01 of the collective bargaining agreement ("CBA") between her union and St. John's. Only if conduct constitutes an "academic issue" may the administration issue a disciplinary letter.

Plaintiff offered to apologize, but only if the records of the incident were destroyed. The Associate General Counsel of the University, defendant Joshua Hurwit, declined her offer, and instead proposed that plaintiff acknowledge that she had "raised her voice" at the students. Plaintiff rejected the counteroffer on the ground of the mis-definition of "academic issue" under the CBA. The appeal was rejected by the Interim Provost, defendant Dr. Simon Møller. He ruled that it was premature because plaintiff had not yet received a "disciplinary action plan" that would follow the disciplinary letter. The matter remains "in limbo."

This claim fails because it has nothing to do with plaintiff's age or gender. The only allegations that plaintiff raises to show the contrary are her belief that: (1) "raising her voice" is a code word for gender discrimination since men are allowed to raise their voice but women are not; (2) about 15 years earlier, Dr. Clark implemented a "productivity point system" that

6

rewarded activities more typically undertaken by younger faculty like teaching instead of activities more typically undertaken by older faculty like sabbaticals; and (3) the last buyout of a faculty member occurred in 2014.[2]  Those allegations are not nearly sufficient to transform a routine workplace grievance into a claim under Title VII or the ADEA.

### B.  Second Claim: "Second discriminatory Article 10.01 action"

Dr. Clark issued a second disciplinary letter based on plaintiff's refusal to attend a meeting with him to discuss "low student evaluations and student complaints" against plaintiff. Instead of having the meeting, she forwarded the disciplinary letter to the Presidents of her unions (apparently there are two unions involved).

Again, other than plaintiff's membership in protected classes for age and gender, plaintiff has alleged no facts supporting an inference of age or gender discrimination.  Obviously, the refusal to discuss poor student evaluations can give rise to disciplinary action.  The fact that it could also be used as a pretext for discrimination does not change a "merely possible" claim to one that crosses the line to "plausible."  Iqbal, 556 U.S. at 678.

To the extent that plaintiff's claim is that Dr. Clark issued the disciplinary letter based on the low student evaluations and student complaints alone, that too does not state a plausible claim.  Plaintiff's belief that Dr. Clark undertook this action because she is "an older female professor" is conclusory and not supported by any factual allegations.

### C.  Third Claim: "Disparate impact on older professors of alleged 'neutral' policy"

Dr. Clark sent emails to another faculty member and plaintiff, pursuant to a communication from defendant Norean Sharpe, Dean of the University, directing him to meet

---

[2] The last two of these allegations appear in the "Background" section of the amended complaint.  I therefore view them as potentially applicable to all of plaintiff's claims as indicating, in plaintiff's view, discriminatory motive.

7

with professors who had "low student evaluations." The only professors who were deemed to have sufficiently low student evaluations to warrant a meeting, according to plaintiff, ranged in age from their late 60s to their early 80s. She offers the names and ages of five professors, including herself, who fell into that category. It is not clear whether the basis for plaintiff's claim is (i) that some aspect of the evaluation forms made it more likely that older professors would receive low evaluations from students; (ii) that plaintiff did not actually receive low evaluations but was required to attend a meeting anyway; (iii) that plaintiff did receive low evaluations but so did other younger professors who were not required to attend a similar meeting; or (iv) some combination of these or any other theory. Regardless of the theory, this claim fails.

Even assuming the evaluation forms resulted in a higher number of older than younger professors receiving low evaluations from the students, "negative evaluations, standing alone without any accompanying adverse results, are not cognizable." Siddiqi v. New York City Health & Hosps. Corp., 572 F. Supp. 2d 353, 367 (S.D.N.Y. 2008) (internal quotation marks and citation omitted). That is particularly the case here because the negative evaluations were authored by students, not defendants, and plaintiff describes nothing about these forms that could plausibly suggest that they were rigged against older professors. Further, as a result of these negative evaluations, plaintiff and others were merely asked to meet with Department Chairs, and the requirement to attend a meeting or even regular meetings is not a materially adverse action. Linell v. New York City Dep't of Educ., No. 15-CV-5085, 2018 WL 1611370, at *7 (E.D.N.Y. Mar. 30, 2018) (requirement to attend meetings, unfavorable schedules or assignments, and excessive work do not constitute an adverse employment actions); Marsh-Godreau v. State Univ. of New York Coll. at Potsdam, No. 15-CV-437, 2017 WL 5891791, at *4

8

(N.D.N.Y. Nov. 28, 2017) (requirement to attend weekly meetings is not a materially adverse change, which must be "more disruptive than a mere inconvenience or an alteration of job responsibilities"). Plaintiff does not suggest that any other adverse action was imposed as a result of these poor evaluations. To the extent that plaintiff's claim is based on any other theory, such as the disparate treatment of older versus younger professors who received equally poor evaluations, plaintiff has not pled sufficient facts to state a plausible claim.

### D. Fourth Claim: "Discriminatory assignment of my preferred summer session class to a younger male professor"

Plaintiff requested to teach a particular summer course offering. Instead, it was given to a 43-year-old male. Dr. Clark refused to make a reassignment. The CBA provides that as between two qualified professors, the more senior should receive their requested course. At plaintiff's request, Dr. Clark met with the Personnel and Budget Committee ("PBC"), which has final approval for all teaching assignments. Dr. Clark, however, "refused to let the Committee vote."

These allegations state a plausible claim. If the CBA is unambiguous in favoring seniority and plaintiff's request was denied in favor of a more junior faculty member, that might give rise to a *prima facie* case. Plaintiff alleges that she lost out on a significant amount of compensation as a result of this decision, which constitutes a material adverse action. Defendants may have a valid explanation for why this assignment was made, or they may contend that the 43-year-old male professor was better qualified, or they may even dispute whether plaintiff timely requested the assignment. But none of that is before me on a Rule 12(b)(6) motion.

### E. Fifth Claim: "Discriminatory removal of graduate classes from my teaching schedule and assignment to younger male professor"

Dr. Clark removed two sections of teaching a graduate course from plaintiff's offering and gave them to a male professor in his 60s. When plaintiff asked him why, he would say only, "issues have arisen." This gave the younger, male professor three sections of the same course, thereby requiring preparation for only one course, while Dr. Clark gave plaintiff three different undergraduate courses requiring preparation for each, a more onerous assignment (according to plaintiff). He did this without consultation or approval of the PBC.

Again, in the absence of any indication from defendants (which they cannot offer at this stage) why plaintiff's allegations are not true, or why plaintiff was given a more onerous workload than the younger professor, the claim is plausible.

### F. Sixth Claim: "Discriminatory assignment of classes to younger professors"

Dr. Clark assigned four younger professors who were less qualified than plaintiff to teach courses that plaintiff had requested. All but one of them is male. These professors were less qualified because three of the four did not have a doctoral degree in economics, unlike plaintiff. Plaintiff has identified them by name and age.

Plaintiff has made sufficient allegations about why these professors were less qualified to make her claim plausible. The amended complaint does not simply assert her belief that they are less qualified; it is factually supported.

### G. Seventh Claim: "Discriminatory removal and reassignment of classes to younger professors"

This claim does not complain of any adverse action towards plaintiff. It complains that Dr. Clark took away the "overload" course from a tenured 65-year-old professor and gave it to a

39-year-old, less qualified adjunct professor. Plaintiff cannot assert a claim on behalf of this other professor and so it is dismissed.

> **H. Eighth Claim: "Retaliation and more Age and Gender Discrimination from bogus allegations of statements related to race discrimination"**

Plaintiff filed an administrative age and gender discrimination complaint against Dr. Clark with the University's Human Resources Department in April 2019. Plaintiff met with defendant Danielle Haynes, Associate Director of Employee Relations, and provided her with additional evidence of systemic discrimination. Ms. Haynes referred plaintiff's complaint to an EEO specialist, defendant Michelle Cadle, who set up a meeting with plaintiff to discuss it on June 11, 2019.

A week before the meeting, however, Ms. Cadle advised plaintiff that she (Ms. Cadle) would also discuss a 25-page transcript of an interview between plaintiff and a former graduate student given more than six years earlier (the "Interview"). Apparently (it is not entirely clear from the amended complaint), the transcript contained statements by plaintiff that raised a concern under the University's EEO policies. (There is a hint that they may have related to the quality or acumen of St. John's students, but I can't be sure.) Ms. Cadle provided a copy of the transcript to plaintiff. It was unsigned and anonymous, but plaintiff learned after the meeting that Dr. Clark had provided it to Ms. Cadle. Plaintiff refused to discuss the transcript at the meeting because it was "unauthenticated."

On July 1, 2019, Ms. Cadle sent plaintiff a letter rejecting her EEO claim on the ground that her (Ms. Cadle's) investigation had failed to find any evidence of age or gender discrimination.

The next day, Ms. Cadle sent plaintiff a letter saying that she (the letter used the collective "we," which plaintiff thinks is significant) had obtained a copy of the audio file of the

11

interview. She advised plaintiff that she wanted to meet with her to discuss it, as well as two other documents that Ms. Cadle had obtained but did not identify, on July 15. Plaintiff declined to attend this meeting because faculty are not obligated to attend meetings during the summer. Plaintiff offered to attend a meeting in September instead.

Plaintiff did not hear back from Ms. Cadle until July 17. Ms. Cadle found that plaintiff had made offensive statements about St. John's students in violation of the University's anti-bias, anti-discrimination policy. However, the University adopted that policy, according to plaintiff, five years after the date of the transcript.

Ms. Cadle forwarded the file on plaintiff's grievance to Dean Sharpe. Dean Sharpe contacted the President of the University requesting that he commence an Article 10 (disciplinary) proceeding, again for "conduct inconsistent with accepted professional and moral standards." Specifically, Dean Sharpe found that four sets of statements contained in the transcript or the audio violated this standard, although plaintiff does not say what they were.

According to plaintiff, "University Statutes" (*i.e.*, rules and procedures incorporated into the CBA) required the President to meet with plaintiff to attempt a resolution. Instead, on August 7, he sent plaintiff a letter relieving her of her duties with pay pending a full investigation. On August 8, defendant Joseph Oliva, the General Counsel of the University, acting as Dean Sharpe's representative, forwarded his Article 10 disciplinary charge to the Committee on Investigation and Advice of Charges against a Faculty Member (the "Investigation Committee").

On October 28, 2019 the Investigation Committee submitted its report to President Gempesaw, but he did not give her a copy. She first read it on January 19, 2020, and it exonerated her of all charges. However, as of May 2020, President Gempesaw has refused to

reinstate her, and she remains suspended without pay.  This has caused plaintiff to lose her stipend for teaching during the Summer, and she is not permitted to participate in University governance.

In addition, the Investigation Committee found that the University had failed to supervise Dr. Kirsten Szylvian and her colleagues, who had uploaded personal interviews to the internet without appropriate protections for the interviewers and interviewees.  Dr. Szylvian is younger than plaintiff, 58 years old.  The interviews included the interview with plaintiff that was the subject of the transcript and audio recording.  Despite this recommendation, the University took no action against Dr. Szylvian.

Plaintiff asserts that the refusal to sustain her administrative complaint was a further incident of age and gender discrimination.  She also contends that the charges initiated by Dr. Clark relating to the Interview were taken in retaliation for her having filed an administrative complaint, and that the refusal to discipline Dr. Szylvian is evidence of anti-age discrimination.

The mere rejection of an administrative grievance is not actionable discrimination.  See Holdmeyer v. Veneman, 321 F. Supp. 2d 374, 382 (D. Conn. 2004), aff'd sub nom. Holdmeyer v. Dep't of Agric., 146 F. App'x 535 (2d Cir. 2005) (denial of grievance alone by decisionmaker who is of a different race than plaintiff is insufficient to raise an inference of discrimination). The discrimination, if it exists, consists of the acts behind the administrative grievance.  Plaintiff cannot double up on the conduct giving rise to the grievance to expand one claim into two unless there was something discriminatory about the grievance procedures themselves.  See, e.g., Agosto v. Corr. Officers Benev. Ass'n, 107 F. Supp. 2d 294, 305 (S.D.N.Y. 2000) (union's refusal to proceed with grievance process could constitute retaliation); Ottaviani v. State Univ. of New York at New Paltz, No. 77 CIV. 6259, 1981 WL 204, at *3 n.11 (S.D.N.Y. June 19, 1981)

(denial by grievance committee would not constitute a "new act of discrimination," but allegations that plaintiff's "*particular* treatment by the grievance officers was discriminatorily motivated" stated a separate claim).

However, the institution of claims against her may constitute prohibited retaliation for her having filed the administrative grievance. The timing suggests that it was – no sooner did Ms. Cadle deny plaintiff's grievance than she served plaintiff with unrelated disciplinary charges. This is sufficient to state a plausible claim of retaliation. See Davis-Garett v. Urb. Outfitters, Inc., 921 F.3d 30, 44 (2d Cir. 2019) ("[A] causal connection between the protected activity and the company's adverse employment action can be established by showing that the employer's action followed the protected activity closely in time."); see also Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

## I. Ninth Claim: "Age and Gender Discrimination and Retaliation for filing a complaint against the EEO Specialist" (*i.e.*, Ms. Cadle)

Plaintiff filed an administrative grievance against Ms. Cadle because, according to plaintiff, she "failed to follow statutory and contractual procedures in the CBA and the University's own policies." It is not clear if the alleged failure was the denial of plaintiff's prior grievance, or the institution of the Interview charge, or both. In any event, Mr. Oliva, acting on behalf of Dr. Wong, denied this new grievance, and plaintiff's appeal was rejected by defendant Nada Llewellyn, Associate Vice President of Human Resources.

This claim is entirely unclear. If plaintiff is complaining about the denial of her grievance as a discriminatory act, it is not, for the reason set forth above. As far as retaliation, the claim does not state what retaliation occurred for plaintiff having filed this grievance.

**J.     Tenth Claim:** *"Retaliation for Filing an Age and Gender Discrimination and Retaliation Lawsuit against the University and Several of its Administrator"* [sic]

One month after plaintiff commenced the instant lawsuit, defendant Oliva sent plaintiff a letter advising her that the University was rejecting her exoneration by the Investigating Committee and was bringing formal charges against her notwithstanding the Investigation Committee's exoneration of her.[3]  She contends that the charges were procedurally and substantively defective; the letter did not adequately advise her of the charges against her; and the charges were in retaliation for having commenced this lawsuit.

Retaliation for having commenced an employment discrimination lawsuit is well-recognized as actionable.  See Johnson v. J. Walter Thompson U.S.A., LLC, 224 F. Supp. 3d 296, 313 (S.D.N.Y. 2016) (employee engages in protected activity by filing discrimination lawsuit).  The timing of the bringing of the formal proceeding and the absence of specific charges against plaintiff makes the claim plausible.

**K.     Eleventh Claim:** *"Age Discrimination"*

This claim repeats the allegations from plaintiff's Eighth Claim concerning the University's refusal to discipline Dr. Szylvian.  It is not a separate, viable claim.  It may be evidence of discriminatory intent as to plaintiff's other alleged acts of discrimination, but I am not called upon to decide the admissibility of such evidence now.

---

[3] I am inferring from these allegations that proceedings before the Investigations Committee are conciliatory in nature, and that the University is not bound by its recommendation, but may instead decide to proceed unilaterally with disciplinary charges.

### L. Twelfth Claim: *"Discrimination, Disparate Impact, and Hostile Work Environment"*

This appears to be a reiteration of parts other claims. It offers no new facts, just argument. It fails to state a claim. To the extent plaintiff intends to allege that she has been subjected to a hostile work environment, it fails to allege facts showing a pattern of severe or pervasive conduct that rises to that level. See Fox v. Costco Wholesale Corp., 918 F.3d 65, 74 (2d Cir. 2019) (hostile work environment claimant must show that "the harassment was 'sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment'" under a subjective and objective analysis). This is a series of discrete and routine academic workplace grievances over the assignment of courses, the use of student evaluations, and the administration of academic discipline. Some of those discrete and relatively inoffensive acts may constitute Title VII claims at this early stage, as set forth above, but they do not support a separate claim for hostile work environment. See id. ("Courts look to the totality of the circumstances to determine whether a plaintiff has met this burden, including proof of 'the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with [the plaintiff's] work performance.'").

### III. Other Issues

Based on the analysis above, plaintiff has stated a claim upon which relief could be granted against the University as to her fourth, fifth, sixth, part of her eighth, and tenth claims. However, there are other bases upon which defendants seek dismissal of those claims or parts of them.

### A. Exhaustion

Plaintiff's EEOC administrative complaint checked the boxes for discrimination based on age and gender. It then contained the following narrative:

> I have worked for the above-named entity since (1980) over 35-years and have recently been subjected to retaliation for having complained about age (72) and sex (gender female), in violation of the Age Discrimination in Employment Act (ADEA), as well as, Title VII of the Civil Rights Act of 1964, as amended (Title VII). On April 30, 2019, I complained internally about not receiving an assigned course that was assigned to a younger male professor, Dr. Alex Gevorkyan (40s) who was assigned the summer course. After my complaint, I was disciplined with fabricated and baseless claims of racial discrimination. The claim stems from a 25-page interview that a student took of me six years ago for his class grade which was posted on St. Johns website. I was disciplined on August 7, 2019, by St. Johns President. Dr. Conrado Gempesaw and suspended from work with pay for not adhering to St. Johns values. Since my suspension 4 younger professors [T. Freiburg (34); J. Chebly (33); C. Kane (38) and M. Flaherty (37)) have replaced me. I believe that at least 6 older professors are being targeted for removal with fabricated claims of student complaints, excessive scrutiny of performance, disparate assignments and false misconduct allegation, in violation of Title VII, ADEA, State and Local Laws.

This is sufficient to exhaust the surviving claims listed above. See Duplan v. City of New York, 888 F.3d 612, 622-23 (2d Cir. 2018); Legnani v. Alitalia Linee Aeree Italiane, S.P.A, 274 F.3d 683, 686 (2d Cir. 2001).

### B. Individual liability

Plaintiff concedes that Title VII and the ADEA do not provide for individual liability, and so those claims as against the individual defendants are dismissed. The remaining question, as to her surviving claims, is whether she has alleged sufficient facts to state a plausible claim under the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.*, or the New York City Human Rights Law, N.Y. City Admin. Code § 8-101 *et seq.*, against the individual defendants that she has named in those claims. The individual defendants referenced in the

surviving claims are principal or important decision makers or executors in the acts taken against her, and the claims against them shall therefore proceed.

C. **Labor and Management Relations Act preemption**

At this stage, defendants have not convinced me that plaintiff's surviving claims are preempted by the Labor and Management Relations Act. An employment discrimination claim will be preempted by the existence of a collective bargaining agreement if the court is required to interpret it to afford plaintiff relief or if there are significant disputed terms necessary for plaintiff to prevail on her employment discrimination claims. See Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 261 (1994) ("[W]here the resolution of a state-law claim depends on an interpretation of the CBA, the claim is pre-empted."). However, passing reference to the terms of a collective bargaining agreement does not warrant preemption, see Wynn v. AC Rochester, 273 F.3d 153, 157 (2d Cir. 2001) ("[T]he bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished.") (quoting Livadas v. Bradshaw, 512 U.S. 107, 124 (1994)), and non-compliance with a collective bargaining agreement can constitute some evidence of discriminatory motive when combined with other facts, see Stern v. Trustees of Columbia Univ., 131 F.3d 305, 313 (2d Cir. 1997) (departures from procedural regularity in employment decisions can raise a question of good faith).

D. **C.P.L.R. Article 78**

Defendants assert that plaintiff has a remedy under Article 78 of the C.P.L.R. that she must pursue before bringing these claims in federal court. The Second Circuit has recently held to the contrary. See Purcell v. New York Inst. of Tech., 931 F.3d 59, 64-65 (2d Cir. 2019).

## CONCLUSION

Defendants' motion to dismiss is granted except as to claims 4–6, that portion of claim 8 alleging retaliation, and claim 10, and the action shall proceed against the individual defendants named in those claims – Clark, Cadle, Sharpe, Hurwit, Gempesaw, and Oliva – under the NYSHRL and the NYCHRL only. The case is referred to Magistrate Judge Bloom for pretrial management.

**SO ORDERED.**

                                                      _Digitally signed by Brian M. Cogan_
                                                                                         U.S.D.J.

Dated: Brooklyn, New York
        July 2, 2021